## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

POWERCOMM, LLC,                    )
Plaintiff                         )
                                  )
                    v.            ) C.A. NO. 09-cv-30109-MAP
                                  )
HOLYOKE GAS & ELECTRIC            )
DEPT., ET AL.,                    )
Defendants                        )


## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DEFENDANTS' MOTION TO STRIKE EXPERT REPORT, PLAINTIFF'S MOTION TO COMPEL, PLAINTIFF'S MOTION TO STRIKE DEFENSE EXPERTS' REPORTS AND TESTIMONY, AND PLAINTIFF'S MOTION TO FILE SUPPLEMENTAL EXPERT REPORTS
### (Dkt. Nos. 27, 28, 38, 40, 45)

### October 19, 2010

PONSOR, D.J.

## I.   INTRODUCTION

Plaintiff filed this eight-count complaint against Defendants, who include Holyoke Gas & Electric Department ("HG&E") and five employees of HG&E: James M. Lavelle, General Manager; Brian C. Beauregard, Superintendent of Electric Division; Jeffrey Brouillard, Electric Distribution Engineer; Michael Costello, General Foreman; and Charles L. Martel, Facilities and Environmental Health and Safety Coordinator.  The complaint alleges violation of 42 U.S.C. § 1981 (Counts I-III), violation of 42 U.S.C. § 1983 (Counts IV and V), violation of Mass. Gen. Laws ch. 12, § 11I (Count

VI), violation of 42 U.S.C. § 1985 (3) (Count VII), and violation of Mass. Gen. Laws ch. 93A (Count VIII).[1] Defendants now seek summary judgment on all counts.

## II.   FACTUAL BACKGROUND

Under the familiar summary judgment standard, the facts are recited in the light most favorable to the non-moving party, with all reasonable inferences drawn in that party's favor.   Klaucke v. Daly, 595 F.3d 20, 24 (1st Cir. 2010).

## A.   The Parties.

Plaintiff is a Virginia-based, family-owned electrical business that has been doing work in Holyoke since 1997. Plaintiff is not certified as a minority business, and over fifty percent of its employees are Caucasian.   (Kwasnik Dep., Ex. 7, 197:19-20.)   Plaintiff is owned by Olga Bruce[2] ("Bruce") and her son David Kwasnik ("Kwasnik").   Bruce, who is of Puerto Rican descent, lived in Holyoke from 1952 to 2002, when she moved to Virginia.   Bruce was an HG&E commissioner for a number of years, including 1990 when her photograph appeared in HG&E's annual report.[3]   (Ex. A.)

---

[1] On November 20, 2008, the Massachusetts Commission Against Discrimination ("MCAD") affirmed its dismissal of Plaintiff's identical complaint for lack of probable cause.

[2] Bruce has been known throughout her career by several last names: Bruce, Perez, Bruce-Perez, and Kwasnik.

[3] It is unclear from the record when exactly Bruce served as a commissioner. Bruce stated that she was

Kwasnik lived in Holyoke until 2000 when he moved to Virginia.  Kwasnik and his twin brother Alan, who works for HG&E, are Hispanic Americans.

HG&E is a municipally owned utility.  Three commissioners, appointed by the Mayor of Holyoke, select which contracts the utility awards.  Pursuant to Mass. Gen. Laws ch. 30, § 39M, HG&E must award a contract to the "lowest responsible and eligible bidder."

B.   The Parties' Contract History.

Plaintiff first worked with HG&E in 1997 for a short time.  In the early 2000s, in response to a request for bids, Bruce sent a letter to HG&E in which she referred to Plaintiff as "one of the only minority-women held" utility companies in America.  (Ex. D.)  In 2002, Plaintiff was awarded the first of what would be four annual electrical line contracts from HG&E.  For the next five years, HG&E either awarded Plaintiff the annual electrical line contract or extended the contract into the following year without a formal bidding process, with the result that Plaintiff and HG&E worked together continuously from 2002 until August, 2007.

During this time, in 2003, at the request of Bruce,

---

commissioner from 1980 until 1988.  (Bruce Dep., Ex. 6, 6:4-7.)  However, her photograph is in the 1990 brochure.

Alan Kwasnik provided Defendant Beauregard with a brochure
that hailed Plaintiff as a minority-woman-owned business
whose president was Olga Perez.  (Ex. B; Bruce Dep., Ex. 6,
12:24-14:11.)  In 2004, Kwasnik created a website and sought
input from Defendants Beauregard, Costello, and Brouillard.
The website identified Bruce and Kwasnik as Plaintiff's
owners.  (Kwasnik Dep., Ex. 3, 23:6-16.)

C.   Personnel Issues and Alleged Racial Animus.

     In 2004, issues arose between Plaintiff and HG&E
regarding the productivity and qualifications of certain
laborers, including Kwasnik's Hispanic uncles, Gerardo
(Jerry) Perez and Altagege Perez, and the accuracy of
Plaintiff's Daily Reports, which were submitted for billing
purposes.  At some point in 2004, Kwasnik and Costello had a
"heated conversation" in which Costello complained about the
productivity of four laborers, two of whom were Caucasian
and two of whom were Jerry and Altagege Perez.  (Kwasnik
Dep., Ex. 7, 31:1-33:1.)  Kwasnik stated that when he
questioned whether Costello's animosity toward his uncles
was based on their race, Costello answered, "It is what it
is."  (Kwasnik Dep., Ex. 7, 34:5.)

     Memoranda from Beauregard to Plaintiff during this
time, as well as internal HG&E memoranda, demonstrate
Beauregard's specific concerns that Plaintiff was

overcharging for the work of unlicensed laborers and documenting certain laborers as working when, in fact, they were not actually on site.  (Ex. 31, 32.)  In an October 13, 2004, e-mail, Costello informed Beauregard that Jerry Perez's productivity had improved and that he was "functioning adequately as a Laborer."  (Ex. 33.) Nevertheless, on November 1, 2004, Beauregard sent a memo to Kwasnik with a list of concerns, primarily "the high number of laborers and/or non-qualified linemen" working on the project, and requesting copies of all certificates and licenses for the workers on Plaintiff's crew.  (Ex. 34.)

Altagege Perez has submitted a declaration stating, without specifics, that he heard both Costello and Brouillard make disparaging comments about Puerto Ricans when he worked for Plaintiff at HG&E job sites from 2004 through 2007.  (Perez Decl., Ex. BL.)  According to Michael Sharp, a former foreman for Plaintiff, in early 2007 Costello referred to Kwasnik as a "Puerto Rican gangbanger" and told Sharp to warn Kwasnik that he did not want to see him at any HG&E job sites and that "if he did see Mr. Kwasnik he would make it more difficult for PowerComm to provide services and may even terminate PowerComm's contract with HG&E."  (Sharp Decl., Ex. BK, ¶¶ 10-11.)  Sharp stated that after hearing this, Kwasnik went to the job sites with

less frequency.  (Id. at ¶ 13.)[4]

D.   2007 Accident.

On June 21, 2007 -- a period covered by the 2006
contract, which ran from August 27, 2006, through August 25,
2007 -- an employee of Plaintiff was electrocuted while
working at an HG&E site and suffered severe non-fatal burns.
(Ex. 22.)  On the day of the accident, Plaintiff had two
employees working for HG&E, the lineman who was injured and
his supervisor.  (Kwasnik Dep., Ex. 7, 115:18-24.)  As per
standard procedure, HG&E instituted a work stoppage, or
"stand-down," and locked HG&E's trailer that Plaintiff had
been using as an office.  (Id. at 95:12-15.)  Defendants
informed Plaintiff that it could do no work while the stand-
down was in effect.  (Martel Dep., Ex. 13, 91:8-12; 119:11-
14; Lavelle Dep., Ex. 8, 32:14-18.)

In the period following the electrocution, the
Occupational Safety and Health Administration ("OSHA")
commenced an investigation, which is standard procedure, and
Defendants hired Proteus Engineering to conduct an
independent investigation.  This was the first time that
HG&E had hired a private investigator following an accident.
(Martel Dep., Ex. 13, 93:4-16.)

_____

[4] During oral argument, Plaintiff's counsel proffered
that in 2004, Defendant expelled all its Hispanic workers.
The record does not support this claim.

OSHA issued its report and citation on July 11, 2007, which included a fine to Plaintiff of $1500.00, and Proteus Engineering issued its report on September 24, 2007.  In mid-September, Plaintiff for the first time requested and was granted access to its equipment and trailer.  (Kwasnik Dep., Ex. 7: 95:22-96:2.)  Although Plaintiff did not receive any communication from HG&E that the 2006 contract ended, the contract expired on August 25, 2007, by its terms.  (Id. at 112:18-22.)   The stand-down ended on this date as well.  (Lavelle Dep., Ex. 8, 37:1-24.)

E.   2007 Contract.

On August 17, 2007, HG&E invited fourteen potential bidders, including Plaintiff, to submit bids for the 2007 electrical line contract for the period of September 2, 2007, through August 30, 2008 ("2007 contract").  Once the bids were in, HG&E Purchasing Coordinator Yocelyn Delgado[5] vetted them to ensure that the bidding contractors were qualified.  (Lavelle Dep., Ex. 8, 18:13-19:1.)  Delgado may seek input from relevant departments at HG&E in making this determination but does not recall whether she did so regarding the 2007 contract.  (Id. at 20:1-3; Delgado Dep.,

---

[5] Yocelyn Delgado changed her name from Yocelyn Figueroa at some point during this litigation.  She is referred to by both names in the record but only by Delgado in this memorandum.

Ex. BY, 107:7-18.)  For the 2007 contract, Delgado determined that the bid from Mike Williams d/b/a Williams Construction ("Willco") was nineteen percent lower than the next lowest bid, that from Plaintiff.[6]  (Ex. 42.)  On August 21, 2007, Delgado sent a memorandum to Lavelle recommending that the primary contract be awarded to Willco as "the lowest responsible and eligible bidder on all labor rates," with the secondary contract to Plaintiff.[7]  (Ex. 41.)  The HG&E Commission accepted the recommendation on August 29, 2007.  (Id.)

     Massachusetts' competitive bidding statute mandates that within ten days of notification of a contract award, a contractor obtain a bond to secure payment for labor, materials, and other charges pursuant to Mass. Gen. Laws ch. 149, § 29.  Mass. Gen. Laws ch. 30, § 39M(c).  Willco was unable to provide the requisite bond but offered in its place an irrevocable letter of credit.  The record does not specify on what date Willco made this offer.  However, on

─────────────────

     [6] Because Willco's bid is not included in its entirety in the record, the court has relied on Defendants' internal memoranda comparing the bids for the 2007 contract as well as on David Kwasnik's testimony that Plaintiff's bid was the second lowest. (Kwasnik Dep., Ex. 3, 126:21-24.)

     [7] If the primary contract holder is unable to perform, the contract is automatically awarded to the secondary contract holder without requiring a solicitation of new bids.

October 30, 2007, two months after the Commission had accepted the recommendation to award the contract to Willco, Delgado called Patrick Flaherty in the Bid Protest Unit of the Attorney General's office to inquire whether such a letter satisfied the statute. (Delgado Dep., Ex. BY, 42:23-24.) Flaherty informed Delgado that the letter would suffice. (Id.) Delgado's conversation with Flaherty was limited solely to the issue of the letter of credit and did not concern the ten-day limitation period of the statute.

On November 9, 2007, Delgado sent a letter to Flaherty to confirm their conversation and to inform him that she would be relying on his advice in accepting the irrevocable letter of credit. (Ex. 51.) Upon receiving this letter, Flaherty called Delgado and informed her that, on further review, his initial advice was incorrect and that a letter of credit would not satisfy the statute's bond requirement. (Delgado Dep., Ex. BY, 160:5-8.)

In the meantime, Plaintiff was offered and refused the award of the secondary contract. The earliest documentation of this refusal is October 31, 2007, in a letter from Delgado to Plaintiff's attorney, which references several earlier telephone conversations in which Plaintiff's counsel indicated that Plaintiff would not sign the secondary

contract.[8]  (Ex. 49.)

On December 31, 2007, Delgado sent a memorandum to
James Lavelle, informing him that Willco was unable to
provide the required bond and recommending that HG&E rebid
the project.  The Commissioners accepted this recommendation
on January 9, 2008.  On February 19, 2008, HG&E opened the
bidding for what would become the 2008 contract.  (Ex. 56).
On this same date, Plaintiff's attorney sent a letter to
Lavelle to inform him that Plaintiff was declining to bid
because it was filing suit against HG&E for discrimination
and breach of contract.  (Ex. 57.)  Plaintiff never
approached the Commission or contacted the Attorney General

---

[8] **Further evidence of discussions regarding the award
to Plaintiff of a secondary contract is an October 19, 2007,
telephone message, the transcription of which is in the
record.  In this message, Beauregard encouraged Kwasnik not
to seek return of Plaintiff's bid deposit because, without
it, by statute, HG&E could not award Plaintiff the secondary
contract.  Beauregard stated:**

> **we had a secondary contract that we are actually hoping
> that you are going to sign, and we were probably going
> to be using the secondary over for projects that we're
> going to start in about April. . . . In addition to –
> because we don't see Williams stacking up – and the
> other thing is if Williams for whatever reason doesn't
> meet performance or whatever you know, the primary
> contract would fall to you.**

**(Ex. 47.)
The message goes on to inform David about extensive
projects in the near future on which HG&E hopes Plaintiff
will bid and ends, "If there's any questions give me a call.
Thanks Buddy."  (Id.)**

to protest the bidding process.  (Dkt. 30, ¶ 46.)

## III. DISCUSSION

### A.   Legal Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact.  The burden then shifts to the opposing party who must demonstrate that a reasonable jury could return a verdict in its favor based on the evidence.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### B.   Violation of 42 U.S.C. § 1981 (Counts I-III).

Plaintiff alleges that Defendants violated 42 U.S.C. § 1981 by prematurely terminating the 2006 contract, failing to accept Plaintiff's bid on the 2007 contract, and creating a hostile work environment, all on the basis of racial animus.[9]

Section 1981 prohibits racial discrimination between

---

[9] Defendants' assertion that Plaintiff cannot bring a § 1981 claim because independent contractors are not employees is without merit.  See Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 14 (1st Cir. 1999) ("Section 1981 does not limit itself, or even refer, to employment contracts but embraces all contracts and therefore includes contracts by which a corporate independent contractor . . . provides service to another corporation.").

contracting parties.  To state a claim under § 1981, "a plaintiff must show (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute."  Garrett v. Tandy Corp., 295 F. 3d 94, 98 (1st Cir. 2002).  Those activities include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Defendants do not dispute that Bruce and Kwasnik are Hispanic or that the conduct in question falls within the activities protected by the statute.  The dispute concerns only whether the evidence, viewed in Plaintiff's favor, would support a jury's conclusion that Defendants discriminated against Plaintiff on the basis of Bruce and Kwasnik's race.[10]

    1.   Termination of 2006 Contract.

-----

[10] Although Defendants contend that they were unaware of Bruce and Kwasnik's race or that Plaintiff is a minority-owned business, the record contains sufficient, albeit thin, evidence in the form of Plaintiff's brochure and website for a reasonable jury to find that Defendants had such knowledge.

Plaintiff alleges that Defendants' conduct following the 2007 accident was rooted in racial animus. Specifically, Plaintiff contends that the institution of the unusually long stand-down and the retention of the private investigator were adverse employment actions because they resulted in premature termination of the 2006 contract.[11] Although Plaintiff has identified no direct evidence of race-based discrimination, by pointing to indirect evidence, Plaintiff has established a prima facie case of discrimination.  Straughn v. Delta Air Lines, Inc., 250 F. 3d 23, 33 (1st Cir. 2001) (where plaintiff provides no direct evidence of discrimination, prima facie case requires a plaintiff to show membership in a protected class; adverse employment action; qualification for the employment held, and the fact that the position remained open or was filled

---

[11] To the extent that Plaintiff alleges that Defendants breached the 2006 contract, the allegation rests on the following contract provision: "The work performed under this contract will be for the annual period between August 27, 2006, and August 25, 2007 with an option for an additional one (1) year."  (Ex. J.)  Plaintiff contends that Defendants breached the contract because they did not allow Plaintiff to exercise that option, yet the record contains no evidence that Plaintiff attempted to exercise the option and was rebuffed.  See also Mass. Gen. Laws ch. 30B, § 12(c)(5) (2010) (Where a governmental contract includes an option to renew, the "governmental body shall retain sole discretion in exercising the option, and no exercise of an option shall be subject to agreement or acceptance by the contractor.").

by a person with similar qualifications).  See Douglas v.
J.C. Penney Co., 474 F.3d 10, 14 (1st Cir. 2007) ("[T]he
burden for establishing a prima facie case is not onerous").
Defendants now must provide "'a legitimate, non-
discriminatory reason for its adverse employment action.'"
Douglas, 474 F. 3d at 14 (quoting McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802 (1973)).

It is undisputed that the general purpose of a stand-
down is to provide a contractor time to institute measures
to prevent the occurrence of a similar accident. (Martel
Dep., Ex. 13, 114: 5-8; 94: 22-24.)  Stand-downs can last
for various lengths of time.  For example, when an accident
occurred while a corporation named Asplundh was under
contract with HG&E for tree work, Asplundh instituted its
own stand-down and investigation, which lasted for two
months.  (Lavelle Dep., Ex. 8, 37:1-12; Beauregard Dep., Ex.
11, 203:19-22.)

As to the length of Plaintiff's stand-down, Defendants
have explained, and Plaintiff has offered no evidence to the
contrary, that Proteus Engineering did not submit its
investigative report with suggestions for preventive
measures until after the 2006 contract expired.  (Beauregard
Dep., Ex. 11, 167: 18-22.)  Moreover, Defendants assert that
on the date of the accident, Plaintiff was in the process of

concluding its work, and no further work was scheduled under the contract. (Beauregard Dep., Ex. 11, 202:21-203:3.) Again, Plaintiff has offered no evidence to the contrary.

As to the hiring of the private investigator, Defendants admit that they had not independently investigated other accidents.  However, Beauregard stated that he hired an independent investigator because HG&E has "similarly situated personnel" who do similar work. (Beauregard Dep., Ex. 11, 204:16-205:3.)  Because the 2007 accident was directly related to work that Defendants did themselves, namely working on electrical lines, Defendants had a particular interest in conducting their own investigation to prevent further such accidents.  Defendants note that the other stand-downs cited by Plaintiff occurred after accidents involving independent contractors doing demolition or tree work, which is work that Defendants never do themselves.  Accordingly, Defendants had no need to investigate how to prevent such accidents.  (Id.)

"Pretext may be established 'by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons.'"  Straughn, 250 F. 3d at 41 (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000)).  Plaintiff has not offered an iota of

supporting evidence to support its allegation that
Defendants' post-accident conduct was racially motivated.
Under these circumstances, no reasonable jury could find
that the 2006 contract was terminated early, that its
termination was due to racial animus, or that Defendants
discriminated against Plaintiff in any way.

    2. <u>Failure to award 2007 contract to Plaintiff</u>.

    As noted, Plaintiff also alleges that Defendants'
failure to award Plaintiff the 2007 electrical line contract
was a discriminatory act.  Specifically, Plaintiff argues
that Defendants allowed Willco extra time to provide the
requisite bond because of their racial animus toward
Plaintiff.  Defendants state that their fiduciary duty to
their ratepayers required them to give additional time to
Willco to provide the bond because of the discrepancy
between Willco's bid and Plaintiff's bid, a very significant
savings of nineteen percent.  (Beauregard Dep., Ex. BT,
173:3-10.)

    Plaintiff's argument fails on many levels.  As a
threshold matter, while there is no question that
"compliance with the competitive bidding statute" includes
payment of a bid deposit, <u>J. D'Amico, Inc. v. Worcester</u>, 472
N.E. 2d 665, 667 (Mass. App. Ct. 1984), Plaintiff has
identified no case law, nor has this court found any, that

16

suggests that an extension of the ten-day payment period
prescribed by Mass. Gen. Laws ch. 30, § 39M(c), is
impermissible.[12]

Moreover, as to establishing a prima facie case of
discrimination, Plaintiff has identified no "'adverse
employment action.'"  Straughn, 250 F.3d at 33.  HG&E
retracted Willco's contract offer once it was clear that he
was unable to provide the bond.  By this point, Plaintiff
had refused HG&E's offer of the secondary contract and had
withdrawn its bid.  Thus, the action that adversely impacted
Plaintiff was Plaintiff's own removal of itself from the
bidding process.

Finally, even if HG&E's extension of time was improper,
the only race-based evidence that Plaintiff offers
concerning the 2007 contract is that Plaintiff is a
minority-owned company and Willco's owner is Caucasian.  The
record is entirely devoid of evidence that HG&E's conduct
was intentionally discriminatory.  See Goodman v. Bowdoin
College, 380 F.3d 33, 43 (1st Cir. 2004) (plaintiff must

_____

[12] Delgado, who handles the bidding process for HG&E and
who oversaw all of the contracts between Plaintiff and HG&E,
testified that "the AG and AG's office have verbally stated
that if it's in the City's best interest upon mutual
agreement the contractor can have more time than what the
statute says as long as it's mutually agreed upon."
(Delgado Dep., Ex. BY, 45:21-46:2.)  This agreement, Delgado
stated, need not be formally memorialized. (Id. at 46:12-
14.)

show that defendant discriminated on the basis of race, the
discrimination was intentional, and the discrimination was a
substantial factor in the defendant's actions).

   3. Hostile Work Environment.

   Plaintiff's claim that it was subjected to a hostile
work environment fails because, even assuming the veracity
of all of Plaintiff's allegations of race-based conduct, the
harassment was insufficiently "severe and pervasive" to rise
to an actionable level.  Douglas, 474 F.3d at 15.[13]

   While there is no required number of incidents for a
successful hostile work environment claim, "a plaintiff must
show 'more than a few isolated incidents of racial enmity.'"
Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 16 (1st

---

[13] To succeed on a claim of hostile work environment, a
plaintiff must prove:
> (1) that he is a member of a protected class; (2) that
> [he] was subjected to unwelcome sexual [or racial]
> harassment; (3) that the harassment was based upon sex
> [or race]; (4) that the harassment was sufficiently
> severe or pervasive to alter the conditions of
> plaintiff's employment and create an abusive work
> environment; (5) that sexually [or racially]
> objectionable conduct was both objectively and
> subjectively offensive, such that a reasonable person
> would find it hostile or abusive and the victim in fact
> did perceive it to be so; and (6) that some basis for
> employer liability has been established.

Douglas v. J.C. Penney Co., 474 F.3d 10, 15 (1st Cir.
2007) (quoting O'Rourke v. City of Providence, 235 F.3d 713,
728 (1st Cir. 2001)).

Cir. 1999) (quoting <u>Snell v. Suffolk County</u>, 782 F. 2d 1094,
1103 (2d Cir. 1986)).  Here, Plaintiff has identified a
handful of mainly non-specific comments made by Costello or
Brouillard between 2004 and 2007.[14]  Bruce, who was never on
site at HG&E, never heard any comments directly,[15] and
Kwasnik's list of disparaging remarks includes only two that
were made in his presence, neither of which was directed at
him.[16]  Altagege Perez is the primary reporter of the
disparaging comments, yet Plaintiff has not alleged that the
comments interfered with his work performance or that he
found the workplace to be intimidating or hostile.  <u>See
Danco, Inc.</u>, 178 F.3d at 16 (Plaintiff must show "that the
conduct had the purpose or effect of interfering with the
plaintiff's work performance or created an intimidating,
hostile or offensive working environment.").

In fact, Plaintiff has alleged that only one comment
interfered with the work performance of an employee, namely

---

[14] Of the eighteen incidents listed by Plaintiff, ten
are duplicates, leaving eight isolated incidents.

[15] Bruce testified that in either 2004 or 2007, her
brother, Altagege Perez, overheard Costello on the phone one
day making disparaging comments about Puerto Ricans. (Bruce
Dep., Ex. 6, 18:15-29-16.)

[16] Kwasnik referenced disparaging comments that Costello
made about Puerto Ricans but stated specifically that the
remarks were "not involving PowerComm."  (Kwasnik Dep., Ex.
7, 157:12-15.)

that the comment reported to Kwasnik by Michael Sharp that Costello disliked Puerto Ricans caused Kwasnik to stay away from work sites.  Kwasnik stated that he and Plaintiff were both adversely impacted because they each could have benefitted financially if he had been on-site employed as a lineman.  (Kwasnik Decl., Ex. BN, ¶ 17.)  Without minimizing the offensiveness of Costello's alleged isolated comment, standing alone it "does not provide a sufficient basis from which a reasonable fact finder could conclude that [Plaintiff] was subjected to a hostile work environment." Pomales v. Celulares Telefonica, Inc., 447 F. 3d 79, 83 (1st Cir. 2006).  This is particularly true given that Kwasnik never heard the disparaging statement himself and that he testified that also during this time he used to "chit-chat" and have "friendly conversations" with Beauregard, Costello, and Brouillard.  (Kwasnik Dep., Ex. 7, 25:20-26:8.)

For the foregoing reasons, the court will allow Defendants' Motion for Summary Judgment as to Plaintiff's claim of violation of 42 U.S.C. § 1981 (Counts I-III).

  C.  Violation of 42 U.S.C. § 1983 (Counts IV and V).

Plaintiff's claims of equal protection and due process violations under 42 U.S.C. § 1983 fail because they implicate no final policymakers.  "'Section 1983 supplies a private right of action against a person who, under color of

state law, deprives another of rights secured by the
Constitution or by federal law.'"  <u>Redondo Borges v. United
States HUD</u>, 421 F.3d 1, 9 (1st Cir. 2005) (quoting <u>Evans v.
Avery</u>, 100 F. 3d 1033, 1036 (1st Cir. 1996)).  HG&E is a
municipal department of the City of Holyoke.[17]  Section 1983
liability can attach to a municipality when "a deliberate
choice to follow a course of action is made from among
various alternatives by the official or officials
responsible for establishing final policy with respect to
the subject matter in question."  <u>Wilson v. City of Boston</u>,
421 F. 3d 45, 59 (1st Cir. 2005).

Plaintiff's sole allegation concerns Lavelle, whom
Plaintiff argues "was the final policy maker for HG&E in
recommending electrical line contractors" and, in this
capacity, established a policy "to prevent HG&E from
contracting with minority contractors."  (Dkt. 35, Pl.
Opp'n. to Defs'. Motion for Summ. J., 9.)  Lavelle, however,
was not in a position to establish final policy because his
recommendations could not become final without approval from

---

[17] Although possibly a viable argument, Defendants do
not suggest that HG&E was not acting under color of state
law.  <u>See</u> <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345,
350 (1974)(plaintiff must demonstrate "a sufficiently close
nexus between the State and the challenged action of the
regulated entity so that the action of the latter may be
fairly treated as that of the State itself").

the commissioners of HG&E, the final decision makers.[18]
(See, e.g., Ex. 41, Bid Recommendation dated August 21,
2007, from Delgado to Lavelle, stamped as approved by the
Commission on August 29; Ex. 50, Memorandum from Delgado to
Lavelle, stating "On August 28, 2007, the Commission voted
the award of a Secondary Contract to PowerComm, LLC. . . .
PowerComm, LLC. has declined to sign the Secondary contract
with the Department, therefore, it is recommended that the
Commission withdraw the award.")[19]

    Accordingly, as Plaintiff has neither alleged nor
provided any evidence that the commissioners violated
Plaintiff's equal protection and due process rights under 42
U.S.C. § 1983, this court will allow Defendants' Motion for
Summary Judgment as to Counts IV and V.

D.   <u>Violation of Mass. Gen. Laws ch. 12, § 11I (Count VI)</u>.

    The bases for Plaintiff's claim of violation of the

---

   [18] Notably, Kwasnik's statements at his deposition
clearly implied that he knew that Lavelle did not make the
final decisions.  He testified, "I really thought the
commission was going to award me that primary contract.
When I found that they didn't, I was taken aback to say the
least."  (Kwasnik Dep. Ex. 7, 169:15-170:4.)

   [19] Morever, of course, for the reasons stated in the
analysis of the § 1981 claim, even if Lavelle were a final
decision maker, the record is insufficient to support a
claim of violation of any constitutional right.

Massachusetts Civil Rights Act ("MCRA")[20] are Costello's alleged threat that he might terminate Plaintiff's contract if Kwasnik came to the job site and Defendants' alleged threat to breach the contract if Plaintiff did not leave its equipment on HG&E's property.[21]  Assuming without deciding that a threat to breach a contract if adequately supported in the record might form the basis of a cause of action under the MCRA, see Carvalho v. Town of Westport, 140 F. Supp. 2d 95, 100 (D. Mass 2001), Plaintiff's claim fails to offer support that any such threats existed.

While it is true that conduct need not involve potential physical harm to violate the MCRA, Buster v. George W. Moore, Inc., 783 N.E. 2d 399, 410 (Mass. 2003), it nevertheless must be objectively threatening or coercive. Sarvis v. Boston Safe Deposit & Trust Co., 711 N.E. 2d 911, 918 (Mass. App. Ct. 1999) (quotations omitted) ("Evidence of

---

[20] "Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with . . . may institute and prosecute in his own name and on his own behalf a civil action of injunctive and other appropriate equitable relief."  Mass. Gen. Laws ch. 12, § 11I.

[21] Contrary to Defendants' argument, Plaintiff correctly observes that this court's holding in Lecrenski Bros. v. Johnson, 312 F. Supp. 2d 117, 122-23 (D. Mass. 2004) (notice pleading sufficient in MCRA claim), relieves it of any heightened burden in pleading.

threats, intimidation, or coercion is to be measured by an objective standard, not the state of mind of the person threatened."). Costello's supposed threat was passed on via a third party, and Costello himself was, as Plaintiff knew, without authority to terminate a contract.[22] Plaintiff elected not to go to the work site without ever verifying the substance of the supposed threat or even bringing it to the attention of Costello's supervisor.[23] Kwasnik's allegation that he could have made more money had he gone to the site "falls outside the scope of what [is] recognize[d] as 'threats, intimidation or coercion' required to state a claim under the Act." Willits v. Roman Catholic Archbishop, 581 N.E. 2d 475, 480 (Mass. 1991). As to the alleged threat concerning Plaintiff's equipment, Kwasnik described the incident as follows: "I get an email from Jeff stating all work will cease unless [the digger is] here the following Monday. . . . He said that the only work that is scheduled for that particular time is for the digger derrick."

---

[22] Plaintiff has offered no evidence to contradict Defendants' assertion that Costello lacks decision-making power regarding contract awards. (See Beauregard Dep., Ex. BT, 24:15-24; Costello Dep., Ex. 14, 132:11-15 ("[D]o you have any recollection of ordering PowerComm workers off HG&E property? A: No.  I do not have that authority.").)

[23] Kwasnik states that he never reported any racial comments to Beauregard because he believed that Beauregard also held racial animus. (Kwasnik Dep., Ex. BP, 264:3-17.)

24

(Kwasnik Dep., Ex. 7, 59:1-7.)  Quite simply, this is not a
threat.

A reasonable jury could not find that any of the
alleged conduct constituted an actionable threat.
Therefore, Defendants' Motion for Summary Judgment as to
Plaintiff's claim of violation of the MCRA (Count VI) will
be allowed.

E.   Violation of 42 U.S.C. § 1985(3) (Count VII).

Plaintiff alleges that Defendants conspired to deprive
them of their civil rights in violation of 42 U.S.C. §
1985(3).  "With near unanimity, the courts have rejected
complaints containing mere conclusory allegations of
deprivations of constitutional rights protected under § 1985
(3)."  Robinson v. McCorkle, 462 F.2d 111, 113 (1st Cir.
1972).  A conclusory allegation is precisely what Plaintiff
has provided.  Although Plaintiff's opposition to the
summary judgment motion includes a lengthy explication of
the law, Plaintiff has failed to point to any evidence in
the record, nor could this court find any, to demonstrate
that the named Defendants conspired or acted in furtherance
of any conspiracy.  See Aulson v. Blanchard, 83 F. 3d 1, 3-4
(1st Cir. 1996) (citing Griffin v. Breckenridge, 403 U.S.
88, 102-03 (1971)) (Plaintiff alleging conspiracy to
interfere with civil rights under 42 U.S.C. § 1985 (3) "must

allege the existence of (1) a conspiracy, (2) a
conspiratorial purpose to deprive a person . . . of the
equal protection of the laws . . . , (3) an overt act in
furtherance of the conspiracy, and (4) either (a) an injury
to person or property, or (b) a deprivation of a
constitutionally protected right or privilege.").

Even if Plaintiff is correct in contending that a civil
conspiracy claim in Massachusetts requires no evidence of
agreement, see Taylor v. Am. Chemistry Council, 576 F. 3d
16, 34-35 (1st Cir. 2009) (identifying "concert of action"
and "substantial assistance" as accepted theories of tort
liability in Massachusetts),  Plaintiff has advanced no
argument under either theory and has pointed to no facts to
support the claim.  Moreover, the record lacks any evidence
that Defendants acted with the requisite intention of
violating Plaintiff's civil rights.  See Powell v.
Alexander, 391 F. 3d 1, 15 (1st Cir. 2004) (distinguishing
between an intent to act and an intent to "effect a civil
rights violation" in the context of punitive damages).

Defendants' Motion for Summary Judgment as to
Plaintiff's claim of violation of 42 U.S.C. § 1985(3) (Count
VII) will be allowed.

F.   Violation of Mass. Gen. Laws ch. 93A (Count VIII).

Plaintiff's Mass. Gen. Laws ch. 93A, § 9 claim ("93A")

is based on the alleged premature termination of the 2006 contract and Defendants' failure to award the 2007 contract to Plaintiff.  Having determined that Defendants' conduct was not improper in regard to these two contracts, the court will allow Defendants' Motion for Summary Judgment as to Plaintiff's 93A claim.

G.   Non-Dispositive Motions

Given the court's determination that Defendants' Motion for Summary Judgment will be allowed on all counts, the remaining motions (Dkt. Nos. 27, 38, 40, & 45) will be denied as moot.

### IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 28) is hereby ALLOWED.[24] Defendants' Motion to Strike Expert Report (Dkt. 27), Plaintiff's Motion to Compel (Dkt. 38), Plaintiff's Motion

---

[24] It is worth noting that in 2003 Plaintiff brought nearly identical suits against two different defendants. PowerComm Construction, Inc. v. Boston Edison Company, No. 00-10513-JLT (D. Mass. filed March 31, 2003), and PowerComm Construction, Inc. v. RCN-BecoCom, No. 00-11869-JLT (D. Mass. filed March 31, 2003).  The court allowed summary judgment on all counts, holding that the record included no facts to support Plaintiff's contention that the defendants knew they were Puerto Rican.  The record included, primarily, evidence that the defendants had been given Plaintiff's marketing brochure.

to Strike Defense Experts' Reports and Testimony (Dkt. 40),
and Plaintiff's Motion to File Supplemental Expert Reports
(Dkt. 45) are hereby DENIED as moot.   The clerk is ordered
to enter judgment for Defendants.   This case may now be
closed.


It is So Ordered.


                                   /s/ Michael A. Ponsor
                                   MICHAEL A. PONSOR
                                   U.S. District Judge